UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BEARDSLEE, Walter R. & Elizabeth A.; Walter
R. Beardslee, Andrea R. Menzies & John A.
Beardslee as Co-Trustees of THE DRUSILLA
W. BEARDSLEE FAMILY TRUST; BENSON,
Phyllis L. & COCCIA, Lynda B.; DONNELLY,
Nathan J. & Carolyn B. & Kevin P.; DONNELLY,
Rose Ann & Marie S.; HANER, William J. &
Joseph, James; LAWTON, Margaret; MARTIN,
Glen & Lynn M.; McTAMNEY, Joseph E.
& B. Louise; MEAD, Bonnie D. & R. Dewey;
MIDDENDORF, Wayne R. & Cynthia L.;
MOSHER, Jr., Floyd E. & Lesa D. (a/k/a Lesa
Huntington); MOUNTAIN PARADISE CLUB
NY 31 LLC, and James W. Reynolds as Trustee
of the JAMES W. REYNOLDS TRUST;
PFEIL-ELLIS, Mary A. & ELLIS, Kerry K.;
SALAMIDA, Paul R. & Pauline M.; SHAY, Gary
D. & Bonita K.; and VARGASON, Brad A.

                                        Plaintiffs,


                    -v-
                                                    3:12–CV–00242


INFLECTION ENERGY, LLC; VICTORY
ENERGY CORPORATION; and
MEGAENERGY, INC.,

                                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                              OF COUNSEL:

COUGHLIN & GERHART, LLP                   PETER H. BOUMAN, ESQ.
Attorneys for Plaintiffs                  ROBERT R. JONES, ESQ.
19 Chenango Street
P.O. Box 2039
Binghamton, NY 13902

THE WEST FIRM, LLP                                    THOMAS S. WEST, ESQ.
Attorneys for Defendants
677 Broadway
8th Floor
Albany, NY 12207

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

Plaintiffs Walter and Elizabeth Beardslee and other landowners[1] (collectively "plaintiffs") brought this declaratory judgment action against defendants Inflection Energy, LLC ("Inflection"), Victory Energy Corporation ("Victory"), and Megaenergy, Inc. ("Mega") (collectively "defendants") seeking a declaration that certain oil and gas leases entered into between the parties expired at the conclusion of the primary terms of those leases and that the terms have not been extended by force majeure.  See Compl..  Defendants counterclaim seeking a declaration that the leases were extended due to force majeure.

Plaintiffs moved for summary judgment declaring that no force majeure event occurred and that the leases have expired.  Defendants opposed plaintiffs' motion and cross-moved for summary judgment declaring that the leases were extended by force majeure and are in full force and effect.  Plaintiffs opposed defendants' motion and replied in support of their motion.  Defendants replied in support of their motion.

Oral argument was heard on August 30, 2012, in Utica, New York.  Decision was reserved.

---

[1] There are thirty five named plaintiffs in this action, many of whom are husband and wife.  For brevity, all thirty five plaintiffs named in the caption will not be repeated here.

## II. BACKGROUND

### A. Oil and Gas Industry in New York State

Gas drilling in New York State is governed by the Environmental Conservation Law. Under the authority of that statute, the State Environmental Quality Review Act ("SEQRA"), N.Y. Envtl. Conserv. Law section 8–0101, was passed "to inject environmental considerations directly into governmental decision making." City Council of Watervliet v. Town Bd. of Colonie, 3 N.Y.3d 508, 515, 822 N.E.2d 339, 341 (2004) (internal quotations omitted).

SEQRA requires all New York State agencies, including the New York State Department of Environmental Conservation ("DEC"), to prepare or cause to be prepared an Environmental Impact Statement ("EIS") for "any action . . . which may have a significant effect on the environment." N.Y. Envtl. Conserv. Law § 8–0109(2).[2] Where the impacts from separate actions are common and predictable, a generic EIS ("GEIS") may be prepared to analyze the impact of all such actions generally and cumulatively instead of preparing an individual (or site-specific) EIS for each action. See N.Y. Comp. Codes R. & Regs tit. 6, § 617.10(a). The purpose of a GEIS is to provide a comprehensive review of the potential environmental impacts of an activity and how those impacts could be mitigated. Subsequent proposed actions which may significantly affect the environment, but which are not

_____

[2] The EIS must include, among other things, "(a) a description of the proposed action and its environmental setting; (b) the environmental impact of the proposed action including short-term and long-term effects; (c) any adverse environmental effects which cannot be avoided should the proposal be implemented; [and] (d) alternatives to the proposed action[.]" Id. § 8–0109(2)(a)-(d).

adequately addressed by a GEIS, require either a supplemental GEIS ("SGEIS") or a site-specific EIS.  See id. § 617.10(d)(4); N.Y. Envtl. Conserv. Law § 8–0109(2).

In 1992, the DEC issued a GEIS addressing the environmental impacts associated with oil and gas exploration.  N.Y.S. Dep't of Envtl Conservation, Generic Envtl. Impact Statement on Oil, Gas, and Solution Mining Regulatory Program (1992), available at http://www.dec.ny.gov/energy/45912.html.  The 1992 GEIS contemplated conventional well fracturing using 20,000 to 80,000 gallons of fluid.

During 2008 there was an increased interest in the issuance of permits for horizontal drilling[3] and high volume hydraulic fracturing ("HVHF" or "hydro fracking")[4] to develop the Marcellus Shale and other low-permeability gas reservoirs.[5]  According to the DEC, the Marcellus Shale is a shale formation extending deep underground from Ohio and West Virginia northeast into Pennsylvania and southern New York.  It is as deep as 7,000 feet or more below ground in some areas.  See N.Y.S. Dep't of Envtl. Conservation, Marcellus Shale (2012), available at http://www.dec.ny.gov/energy/46288.html.  Geologists estimate that it

---

[3]  The DEC's website states that horizontal drilling has been used in New York since the 1980s.  "A 'horizontal well' is first drilled down vertically to a depth above the target gas-bearing rock formation.  Special tools are then used to curve the well so that the hole is drilled horizontally within the gas-bearing rock for up to several thousand feet. . . . Except for special tools used underground, horizontal drilling is performed using the same equipment and technology as vertical drilling, with the same protocols in place for aquifer protection, fluid containment and waste handling."  N.Y.S. Dep't of Envtl. Conservation, Marcellus Shale (2012), available at http://www.dec.ny.gov/energy/46288.html.

[4]  HVHF is an unconventional drilling technology which involves the injection of more than a million gallons of water, sand, and chemicals at high pressure down and across into horizontally drilled wells as far as 10,000 feet below the surface.  The pressurized mixture causes the rock layer, in this case the Marcellus Shale, to crack.  The cracks in the rock are then held open by the sand particles, allowing more gas to flow into the well than would naturally.  See id.

[5]  Historically, the highest natural gas producing geologic formations in New York State have been the Trenton Black River, Medina, Herkimer, and Queenston formations.  See N.Y.S. Dep't of Envtl. Conservation Ann. Rep. 2009, New York State Oil, Gas, and Mineral Resources at 14, available at http://www.dec.ny.gov/docs/materials_minerals_pdf/09anrpt1.pdf ("2009 DEC Annual Report").

may contain up to 489 trillion cubic feet of natural gas.[6]  Id.  Although the gas potential in the

Marcellus Shale is not a new discovery, drilling companies abstained from exploration and

extraction because of the difficulty and expense associated with drilling such a deep

formation.  However, recent advancements in technology and the use of HVHF prompted

drilling companies to reconsider opportunities in the Marcellus Shale.

As a result of the interest in horizontal drilling combined with HVHF, and the unknown

environmental impact caused by it, on July 23, 2008, Governor David Paterson directed the

DEC to update its 1992 GEIS covering oil and gas drilling.  See N.Y. Envtl. Conserv.

Law—Oil and Gas Wells, L. 2008 ch. 376, 2008 N.Y. Sess. Laws 1658–59 (McKinney)

("Directive").  He directed the DEC's update "to address potential new environmental impacts

from drilling, including horizontal drilling in Marcellus shale formations."  Id.  Important

concerns included "potential impacts on groundwater resources, procedures for the

treatment and transport of process water contaminated during drilling operations, potential

impacts on local infrastructure from increased heavy truck traffic, the safety of fluids used in

the hydraulic fracturing of geologic formations and potential cumulative impacts of wide-scale

drilling."  Id.

Accordingly, the DEC commenced the development of a SGEIS.  That process is still

ongoing.  The most recent revised draft SGEIS was released on September 7, 2011, with the

period for public comment ending on January 11, 2012.  According to the DEC, no permit

applications to drill horizontal wells utilizing HVHF in the Marcellus Shale are being

processed pending completion of the SGEIS or preparation of a site-specific EIS.  Any site-

---

[6]  To put this in perspective, New York State uses approximately 1.1 trillion cubic feet of natural gas a
year.  Id.

specific review must take into account the same issues being considered in the SGEIS and must be consistent with the requirements of SEQRA and the Environmental Conservation Law.

According to defendants, the Directive constitutes a moratorium which has effectively brought natural gas development in New York State to a screeching halt.  According to plaintiffs, defendants may, and have acquired permits to drill utilizing the conventional drilling methods contemplated by the 1992 GEIS.  For example, in 2009 there were sixteen vertical Marcellus wells producing in New York State.  See 2009 DEC Annual Report at 5.

### B.  The Instant Leases

Plaintiffs are a group of landowners who reside in Tioga County, New York.  Plaintiffs each[7] entered into separate oil and gas leases with defendant Victory, leasing all oil, gas, and constituents underlying their property, and the rights necessary to develop, produce, measure, and market them (the "Victory leases").  Collectively, the Victory leases encumber approximately 1,200 acres of real property owned by plaintiffs.  Defendant Mega shares an interest in all of the leaseholds with Victory, and as of July 28, 2010, defendant Inflection assumed operational rights and responsibilities under the leases via Mega (with the exception of the leases held by the Beardslees and the Beardslee Family Trust).

The majority of the Victory leases were executed in 2001, although leases were also signed in 2002, 2004, 2005, and  2006.  Most leases contained a five year term, with some leases extended for an additional five years.  The leases provide that "Lessor . . . has granted, demised, leased and let, exclusively unto Lessee, with covenants of general

---

[7]  Some of the leases were entered into jointly by husband and wife, while others were entered into individually or on behalf of a trust.

warranty, for the purpose and with the rights of drilling, producing, and otherwise operating for oil and gas and their constituents."  Countercl. 6, ¶ 6.[8]

The lease term, also known as the habendum clause, provides:  "It is agreed that the lease shall remain in force for a primary term of FIVE (5) years from the date hereof and as long thereafter as the said land is operated by Lessee in the production of oil or gas."  Id. 7, ¶ 7.  This provision, like many habendum clauses, provides that the interest conveyed by the lease exists for a prescribed term of years (here, five), "and as long thereafter" as the land is operated by lessee in the production of oil or gas.  See e.g., Wiser v. Enervest Operating, LLC, 803 F. Supp. 2d 109, 118 (N.D.N.Y. 2011) (Peebles, M.J.).  Habendum clauses "establish a definite (or primary) term in which the lessee [is] permitted to develop the property, with an option for an indefinite secondary term permitting the lessee to reap the long-term value and return on the money spent developing the property during the primary term."  Id. (internal quotations omitted).

The Victory leases also contain a force majeure clause.  A force majeure event is an event beyond the control of the parties which prevents performance under a contract and may excuse non-performance.  See Kel Kim Corp. v. Cent. Mkts., Inc., 70 N.Y.2d 900, 902, 519 N.E.2d 295, 296 (1987).  The clause here provides:

> If and when drilling or other operations hereunder are delayed or interrupted by lack of water, labor or material, or by fire, storm, flood, war, rebellion, riot, strike, differences with workmen, or failure of carriers to transport or furnish facilities for transportation, or as a result of some order, rule, regulation, requisition or necessity of the government, or as a result of any other cause whatsoever beyond the control of Lessee, the time of such delay or interruption shall not be counted against Lessee, anything in this lease to the contrary

---

[8]  The leases also contain a Delay Rental clause, which provides for lessee to pay lessor $2.00 or $3.00 per acre, per year until the commencement of royalty payments.  That provision is not at issue here.

> notwithstanding.  All express or implied covenants of this lease shall be subject to all Federal and State laws, Executive Orders, Rules or Regulations, and this lease shall not be terminated, in whole or in part, nor Lessee held liable in damages for failure to comply therewith, if compliance is prevented by, or if such failure is the result of any such Law, Order, Rule or Regulation.

Countercl. 7, ¶ 8.

According to plaintiffs, no wells have been drilled on any of plaintiffs' lands and no royalties have been paid within the primary term and thus all of the leases have expired.  In 2005 and thereafter, defendants drilled multiple wells in the Trenton Black River and Oriskany formations in Tioga County in the area of plaintiffs' properties.  None of the wells were commercially productive.  Specifically, defendants drilled multiple wells targeting the Trenton Black River on lands pooled with the Mead plaintiffs' property, and each attempt to achieve commercially viable production failed.

In 2010, Inflection sent notices of extension to plaintiffs, purporting to extend the leases based on unforeseen governmental action.  The basis of the unforeseen governmental action, or force majeure event, was Governor David Paterson's July 23, 2008, Directive.

## III.  DISCUSSION

### A.  Legal Standard—Summary Judgment

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509–10 (1986).  All facts, inferences, and ambiguities must be viewed in a light most

favorable to the non-moving party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).

Initially, the burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56; <u>Liberty Lobby, Inc.</u>, 477 U.S. at 250, 106 S. Ct. at 2511.  A fact is "material" if it "might affect the outcome of the suit under the governing law." <u>Anderson</u>, 477 U.S. at 248, 106 S. Ct. at 2510; <u>see also</u> <u>Jeffreys v. City of N.Y.</u>, 426 F.3d 549, 553 (2d Cir. 2005).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 586, 106 S. Ct. at 1356.  There must be sufficient evidence upon which a reasonable fact finder could return a verdict for the non-moving party.  <u>Liberty Lobby, Inc.</u>, 477 U.S. at 248–49, 106 S. Ct. at 2510; <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 587, 106 S. Ct. at 1356.

With respect to matters of contract interpretation, the intention of the parties controls. <u>SR Int'l Bus. Ins. Co. v. World Ctr. Props., LLC</u>, 467 F.3d 107, 125 (2d Cir. 2006).  "[T]he best evidence of intent is the contract itself; if an agreement is 'complete, clear and unambiguous on its face[, i]t must be enforced according to the plain meaning of its terms.'" <u>Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust</u>, 375 F.3d 168, 177 (2d Cir 2004) (quoting <u>Greenfield v. Philles Records, Inc.</u>, 98 N.Y.2d 562, 569, 780 N.E.2d 166, 170 (2002)).  In the event of an ambiguity, a contract will be construed against its drafter since the drafter is responsible for any ambiguity.  <u>M. Fortunoff of Westbury Corp. v. Peerless Ins. Co.</u>, 432 F.3d 127, 142 (2d Cir. 2005).[9]

---

[9]  For a more elaborate discussion of contract principles as they relate to oil and gas leases, see Magistrate Judge Peeble's discussion in <u>Wiser</u>, 803 F. Supp. 2d at 116–18.

**B. <u>Force Majeure</u>**

The lease term here provides:  "It is agreed that the lease shall remain in force for a primary term of FIVE (5) years from the date hereof and as long thereafter as the said land is operated by Lessee in the production of oil or gas."  Countercl. 6, ¶ 7.  Thus the primary term is five years, at the conclusion of which the leases expire if the land has not been operated by the lessee in the production of oil or gas.  It is plaintiffs' burden on summary judgment to show that defendants did nothing to propel the leases into the secondary, or "as long thereafter" term.  It is undisputed that no operations have been conducted upon the leaseholds, no wells have been drilled, no gas has been stored or protected, no gas has been produced, and no royalties have been paid.  Thus, the primary terms of the subject leases expired when the five year mark hit and defendants failed to conduct any activities upon the leased premises.  For purposes of this analysis, plaintiffs have established that the leases terminated.

Defendants assert that the Directive qualifies as a force majeure event which extends the leases.  They contend the Directive resulted in a delay in drilling by governmental order beyond their reasonable control and was unforeseeable.  Plaintiffs counter that based on defendants' extensive knowledge and experience in the oil and gas industry, they should have known that further environmental review relating to HVHF would be required and thus the moratorium resulting from the Directive was foreseeable.  They also point out that defendant Inflection bought into the situation in 2010, knowing full well that New York had placed a hold on HVHF.  Finally, plaintiffs argue that defendants' ability to perform under the leases is not affected by the Directive because permits for conventional drilling methods are still being issued, and other formations beside the Marcellus Shale are available for drilling.

Defendants argue HVHF is the only commercially viable method of drilling to obtain oil or gas from plaintiffs' lands, and that commercial viability must be taken into account when determining impossibility of performance and frustration of purpose under the leases. They submit it would be unreasonable and irresponsible to drill using traditional methods which they know would not be profitable, particularly in light of their obligation under the leases to produce marketable gas and provide royalty payments to plaintiffs.

The primary purpose of a force majeure clause is to "relieve a party from its contractual duties when its performance has been prevented by a force beyond its control or when the purpose of the contract has been frustrated." Phillips Puerto Rico Core, Inc. v. Tradax Petroleum, Ltd., 782 F.2d 314, 319 (2d Cir. 1985). As the party invoking the doctrine, defendants carry the burden to establish force majeure. Id. Under force majeure, "[m]ere impracticality or unanticipated difficulty is not enough to excuse performance." Phibro Energy, Inc. v. Empresa de Polimeros de Sines Sarl, 720 F. Supp. 312, 318 (S.D.N.Y. 1989). Finally, "a force majeure clause must include the specific event that is claimed to have prevented performance." Id. (citing Kel Kim Corp., 70 N.Y.2d at 902–03, 519 N.E.2d at 296).

The force majeure clause here does not extend the leases. Even if the Directive constituted a force majeure event in that it was an "order, rule, regulation, requisition or necessity of the government . . . beyond the control of Lessee," Countercl. 7, ¶ 8, it did not prevent defendants from performing under the terms of the leases. The leases provide that "Lessor . . . has granted, demised, leased and let, exclusively unto Lessee, with covenants of general warranty, for the purpose of and with the rights of drilling, producing, and otherwise operating for oil and gas and their constituents." Id. 6, ¶ 6. Defendants were leased the right to drill, produce, and otherwise operate for oil and gas, but they were not required to do so.

The leases merely provided the option to do.  As defendants did not have an obligation to drill, the invocation of a force majeure clause to relieve them from their contractual duties is unnecessary.

Moreover, the Directive does not frustrate the purpose of the leases.  The purpose of the leases is to drill, produce, and otherwise operate for oil and gas and their constituents. Defendants may still drill, produce, and otherwise operate for oil and gas and their constituents.  The Directive put a halt on horizontal drilling using HVHF; drilling permits for conventional drilling methods have, and continue to be, issued in the area of plaintiffs' lands. The only thing defendants were unable to do during the primary term was to horizontally drill using HVHF.  The leases do not limit defendants' right to drill to a specific type of drilling nor a particular formation.  While defendants submit evidence demonstrating that HVHF in the Marcellus Shale is the only commercially viable method of production and drilling using conventional methods is impractical, "[m]ere impracticality . . . is not enough to excuse performance."  Phibro Energy, 720 F. Supp. at 318.  Defendants did not contract for guaranteed production of oil and gas; they contracted for access, exploration, and the right to drill for a set period of time.

As the drafters of the leases, defendants were in the best position to impose drilling specifications as to the methods used or formations explored.  The parties acknowledge that the oil and gas industry is a speculative business; plaintiffs did not guarantee production nor that defendants would profit, and defendants did not guarantee production nor that plaintiffs would receive royalties.  Had defendants changed their minds during the primary term—for example, had they determined that the leaseholds were no longer commercially viable and

accordingly chose not to drill—they would have been free to continue making delay rental payments and let the leases expire by their primary terms.

Accordingly, the force majeure clause does not extend the leases.

### C. Impossibility and Frustration of Purpose

Finally, to the extent defendants take such a position, "impossibility" nor "frustration of purpose" serve to extend the leases.[10]  Impossibility and frustration of purpose refer to two distinct doctrines in contract law, but both require unforeseeability.  "[T]he impossibility [of performance] must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract."  Kel Kim Corp., 70 N.Y.2d at 902, 519 N.E.2d at 296 (emphasis added).  Frustration of purpose excuses performance when a "virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party."  Gen. Douglas MacArthur Senior Vill., 508 F.2d at 381 (emphasis added).

The Directive was foreseeable.  The 1992 GEIS was the governing regulation in effect when the leases were signed, renewed, and assigned.  That statement contemplated conventional gas well fracturing using 20,000 to 80,000 gallons of fluid.  HVHF involves the injection of more than a million gallons of water, sand, and chemicals.  It is clear that the 1992 GEIS failed to adequately consider the environmental impacts posed by HVHF.  The

---

[10]  Defendants do not expressly rely on the doctrine of impossibility.  They correctly point out that "impossibility of performance is a common law doctrine; whereas, application of the Force Majeure Clause is governed by contract language."  Defs.' Mem. of Law, Dkt. No. 30–3, 20.  According to defendants, foreseeability must be considered when determining impossibility, but not when determining force majeure. Thus, they contend it is irrelevant whether the Directive was foreseeable.

However, defendants also argue the "Moratorium Has Frustrated Defendants' Reasonable Expectations," id. at 30, and that "the Moratorium wholly frustrates the O&G Leases' purpose."  Defs.' Reply Mem. of Law, Dkt. No. 34 at 7.  Foreseeability is relevant to the frustration of purpose doctrine.  See United States v. Gen. Douglas MacArthur Senior Vill., Inc., 508 F.2d 377, 381 (2d Cir.1974).

1992 GEIS is clear that drilling utilizing more than 80,000 gallons of liquid would not be permitted without conducting an SGEIS or performing a site-specific EIS. Therefore, it was foreseeable that a non-conventional drilling method such as HVHF would require additional environmental review. Defendants cannot rely on impossibility nor frustration of purpose to extend the leases.

## IV. **CONCLUSION**

The leases terminated at the conclusion of their primary terms, and defendants cannot invoke the force majeure clause nor the doctrines of impossibility or frustration of purpose to extend the leases. Accordingly, plaintiffs' motion for summary judgment will be granted and defendants' cross-motion for summary judgment will be denied. Finally, as defendants' counterclaims seek a declaration that the leases were extended due to force majeure events, and it has been determined that the leases were not extended, the counterclaims will be dismissed. All of the parties' remaining arguments have been considered and are without merit.

Therefore, it is

ORDERED that

1. Plaintiffs' motion for summary judgment is GRANTED;

2. All of the leases are declared expired by their terms;

3. Defendants' cross-motion for summary judgment is DENIED;

4. Defendants' counterclaims are DISMISSED; and

5. Pursuant to New York General Obligations Law section 15–304, the judgment in this case shall be considered "a document in recordable form cancelling the leases as of

record in the county where the leased land[s are] situated" and may be filed in the

appropriate court and/or county clerk's office.

The Clerk is directed to file a judgment in accordance with this Memorandum-Decision

and Order.

IT IS SO ORDERED.

_____
United States District Judge

Dated:  November 15, 2012
        Utica, New York.